JAMES C. NIELSEN (111889)
*jnielsen@nkllp.law*
DANIEL N. KATIBAH (293251)
*dkatibah@nkllp.law*
STUART E. JONES (104566)
*sjones@nkllp.law*
NIELSEN KATIBAH LLP
100 Smith Ranch Road, Suite 350
San Rafael, California 94903
Telephone: (415) 693-0900
Facsimile: (415) 693-9674

Attorneys for Defendant
UNITED NATIONAL INSURANCE COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. TERMINALS, INC. AND SOCO WEST, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED NATIONAL INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 8:19-cv-00286-ODW-PVC<br><br>**JOINT STIPULATION REGARDING UNITED NATIONAL'S MOTION FOR A PROTECTIVE ORDER AGAINST THE DEPOSITION OF DAVID ELLIOTT**<br><br>Motion Hearing Date: Jan. 25, 2022<br>Time: 10:00 a.m.<br>Courtroom: 590<br>Judge: Hon. Pedro V. Castillo<br><br>Discovery Cutoff: November 19, 2021<br>Pre-Trial Conference: June 6, 2022<br>Trial: June 28, 2022 |

# TABLE OF CONTENTS

United National's Introductory Statement. 1

Plaintiffs' Introductory Statement. 3

Joint Specification of Issues in Dispute. 5

1. United National's position. 6
   - A. Rule 26 protective orders and the "apex" deposition doctrine. 6
   - B. Mr. Elliott is an apex witness. 6
   - C. Mr. Elliott has no unique first-hand, non-repetitive knowledge of the facts at issue in this case. 9
     - i. Mr. Elliott's "final say" on claim decisions. 11
     - ii. Communications between Ms. Hoffman and Mr. Elliott. 13
     - iii. "Mr. Elliott knows the extent to which he approved the handling of Plaintiffs' claim" and "the policies and procedures that he developed and/or maintained for the claims department he oversees." 15
   - D. Plaintiffs did not exhaust all less intrusive means of discovery. 21
2. Plaintiffs' position. 23
   - A. United National has not carried its "heavy burden" of demonstrating that Mr. Elliott should be exempt from deposition. 23
   - B. United National rejected reasonable positions that would have avoided burdening the Court with this motion. 28

This Joint Stipulation is submitted by the undersigned parties under Local Rule 37-2 in connection with the concurrently-filed motion by defendant United National Insurance Company seeking a protective order against the deposition of David Elliott. The deposition was noticed by plaintiffs L.A. Terminals, Inc., and Soco West, Inc., on October 29, 2021, and originally set to occur on November 12, 2021. In accordance with Local Rule 37-1 and the Court's November 18, 2021, Minute Order (Dkt. 95), the parties have met and conferred extensively but have been unable to resolve their dispute.

The parties also note that, while fact discovery in this case ended on November 19, 2021, (Dkt. 72 [case management order]), District Judge Wright expressly granted United National permission to bring its motion for a protective order "as an exception to the" November 19, 2021, cutoff. (Dkt. 97.) Judge Wright likewise granted plaintiffs permission to depose Mr. Elliott after the cutoff "if [United National's] motion is denied" and "subject to any conditions imposed by" this Court in adjudicating the motion. (*Id.*)

**<u>UNITED NATIONAL'S INTRODUCTORY STATEMENT</u>**

In this insurance coverage dispute involving questions of an insurer's alleged duty to defend, alleged duty to appoint independent counsel, and alleged bad faith, plaintiffs noticed the deposition of David Elliott for November 12, 2021. (Declaration of Daniel Katibah [Katibah Decl.], Exh. B [Deposition Notice].) Plaintiffs served the notice on October 29, 2021. (*Id.*, Exh. A [11/11/2021 joint email to Court].)[1] Mr. Elliott is the Senior Vice President of Claims employed by Global Indemnity Group Services, LLC, a subsidiary operating under the banner of Global Indemnity Group, LLC, of which United National is itself a wholly owned subsidiary. (Declaration of David Elliott [Elliott Decl.], ¶¶ 3, 6.)

---

[1] Plaintiffs technically served the notice on October 28, 2021, though service occurred at 11:54 p.m., so the parties' joint email to the Court (Exhibit A) represents the date of service as October 29, 2021.

On November 5, 2021, United National served plaintiffs with a written objection to Mr. Elliott's deposition, informing them that United National intended to seek a protective order under the "apex" deposition doctrine, asking plaintiffs to commence the meet-and-confer process required by Local Rule 37, and stating that United National would not produce Mr. Elliott for deposition until the motion was heard. (Katibah Decl., Exh. C.) Plaintiffs responded on November 8, 2021, arguing that Mr. Elliott was not an "apex" witness in the first instance and that, even if he is, he possesses unique, first-hand and non-repetitive knowledge of the facts at issue in this case. (*Id*., Exh. D [ltr. from K. Jackson to D. Katibah].)

The parties, through counsel, met and conferred on November 10, 2021, and were unable to resolve the dispute. (*Id*., Exh. A.) The next day, the attorneys prepared a joint email to the Court explaining the dispute and requesting an informal discovery conference consistent with this Court's procedures. (*Id*.)

On November 12, 2021, before the conference with the Court, counsel for plaintiffs attempted to take Mr. Elliott's deposition as scheduled in the notice. (*Id*., Exh. I [Elliott deposition and notice of non-appearance].) Counsel for United National appeared and notified the reporter that "[b]efore we proceed, United National is going to adjourn these proceedings for purposes of seeking a protective order pursuant to Rule 30(c)(2)" and advised plaintiffs' counsel "that these proceedings will not proceed" until a motion for a protective order could be filed and ruled on. (*Id*. at Bates No. 081; deposition p. 6.) The deposition ended without any questions or testimony.

On November 17, 2021, the parties and the Court participated in the informal discovery conference. On November 18, 2021, the Court issued a minute order noting that it had "heard from counsel on both sides" and "encouraged the parties to continue their discussions regarding the discovery dispute and attempt to reach a resolution." (Dkt. 95.)

The next day, November 19, 2021, was the fact discovery deadline in this

case. (Dkt. 72 [case management order].) So, consistent with the Court's advice to reach a resolution workable for everyone, the parties filed a stipulation and proposed order (Dkt. 96 and 96-1) asking that Judge Wright (1) allow United National to file a regularly-noticed motion for a protective order with this Court; (2) allowing the Court to retain jurisdiction to rule on the motion despite the lapsed discovery deadline; and (3) allowing plaintiffs to depose Mr. Elliott, consistent with any parameters and restrictions imposed by the Court, in the event the Court denied the motion. Judge Wright granted the stipulation and entered an order consistent with the parties' requests. (Dkt. 97.)

## PLAINTIFFS' INTRODUCTORY STATEMENT

As the Senior Vice-President of Claims for Global Indemnity Ltd., United National's parent corporation, Mr. Elliott had ultimate authority over Plaintiffs' insurance claim that is the subject of this coverage action; he was the direct supervisor of Mark DiGiovanni, who served as United National's Rule 30(b)(6) designee; and he was the indirect supervisor of Randi Hoffman, who is the claims handler who oversaw Plaintiffs' insurance claim in this matter.

Plaintiffs disagree that Mr. Elliott should be exempted from sitting for deposition. Even if he is an "apex" employee, courts have held that an executive may still be required to testify where the evidence indicates that the executive has personal knowledge of facts relevant to the lawsuit – *even where the executive claims he does not*. Facts developed in discovery strongly suggest that Mr. Elliott has first-hand knowledge of United National's handling of Plaintiffs' insurance claim, and of United National's claim handling policies, practices, and procedures which Ms. Hoffman and Mr. DiGiovanni were required to follow.

An April 5, 2019 email from Ms. Hoffman to Mr. Elliott references a discussion they had regarding Plaintiffs' insurance claim just days before United National issued a coverage decision purporting to change its prior coverage position. Mr. DiGiovanni testified that he spoke with Mr. Elliott daily and kept

him updated on every claim; and that while he cannot recall the specifics of what they discussed regarding the claim decisions at issue, he is sure that he would have advised Mr. Elliott, and that with respect to United National's purported change of coverage position, he "would have discussed it with [Mr. Elliott], and he would have approved it." Mr. DiGiovanni also testified that, unless Ms. Hoffman was there, his conversations with Mr. Elliott would only be reflected in the claim notes if he went to Ms. Hoffman and told her what needs to be put in the claim file about the conversation, thus making Mr. Elliott's unfiltered, independent recollection all the more important. Finally, both Mr. DiGiovanni and Ms. Hoffman testified that Mr. Elliott had "final say" over coverage decisions.

Mr. Elliott's declaration that he had no involvement in Plaintiffs' claims stands in contrast to these facts. Moreover, when asked whether United National would stipulate to Mr. Elliott's declaration being introduced into evidence at trial (in lieu of him being deposed), United National refused.

Mr. Elliott should be ordered to sit for deposition. If he truly had no involvement in Plaintiffs' claims (a fact that itself is indicative of the lack of oversight in United National's claims handling, especially since some of the claim decisions at issue were made after this lawsuit was filed), then his deposition will be fairly short. On the other hand, if he was involved in Plaintiffs' claims, the rigors of cross-examination and refreshing his memory through documents should bear that out. In either case, it will still be important to question him on both: (a) how United National's claims decisions are managed (given his purported hands-off approach despite having "final say"); and (b) the policies, practices, and procedures that United National was supposed to follow, especially given Mr. DiGiovanni's testimony that its claims manual is merely "aspirational" (neither of which is addressed in Mr. Elliott's declaration). Under any scenario, a <u>two-hour deposition</u> should be plenty to lock down his testimony and is all that Plaintiffs request.

Plaintiffs have exhausted other, less-intrusive discovery methods prior to seeking this relief. In addition to seeking documents and posing interrogatories, Plaintiffs have deposed Mr. Elliott's subordinates, Randi Hoffman (for a full day), John Malone (for a half day), and Mark DiGiovanni (for a full day).

Plaintiffs have also bent over backward to try to accommodate Mr. Elliott. In an effort to avoid burdening the Court with this motion, Plaintiffs offered to limit their questioning of Mr. Elliott to three hours – all of which Mr. Elliott could conduct remotely so as to not require any travel. United National flatly refused.

Alternatively, on December 14, 2021, Plaintiffs proposed foregoing the deposition altogether if United National would produce certain training materials that it has been withholding, and stipulate to a very finite set of facts (discussed further below) that may be introduced at trial. Yet United National again said "no."

Finally, when Mr. DiGiovanni amended his draft declaration to assert the facts currently stated, Plaintiffs again offered to forego deposing Mr. Elliott if United National would simply agree not to object to it being introduced into evidence for use at trial. Again, United National said "no."

Having declined these reasonable alternatives, and with facts indicating that Mr. Elliott may have first-hand knowledge of Plaintiffs' claims and of United National's policies, practices, and procedures generally, Plaintiffs should be permitted to depose Mr. Elliott for a reasonable period of time (based on his declaration, no more than 2 hours should be needed). Alternatively, Plaintiffs remain willing to accept the production and stipulation offered on December 14 in lieu of Mr. Elliott testifying.

## JOINT SPECIFICATION OF ISSUES IN DISPUTE

The sole disputed issue raised by this motion is whether, under the apex deposition doctrine, the Court should enter a protective order barring or limiting plaintiffs' attempts to depose Mr. Elliott under Federal Rule of Civil Procedure

Rule 26.

**1. <u>United National's position.</u>**

**A. Rule 26 protective orders and the "apex" deposition doctrine.**

Rule 26 states that a "party or any person from whom discovery is sought may move for a protective order in the court where the action is pending." *Id*. at subd. (c)(1). So, a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense including … forbidding the disclosure or discovery; specifying terms, including time and place or the allocation of expenses, for the disclosure or discovery; prescribing a discovery method other than the one selected by the party seeking discovery; [or] forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters[.]" *Id*. at subd. (c)(1)(A)-(D).

Within that framework, "[w]hen a party seeks the deposition of a high-level executive (a so-called "apex" deposition), courts have observed that such discovery creates a tremendous potential for abuse or harassment. Courts have discretion to limit discovery where the discovery sought can be obtained from some other source that is more convenient, less burdensome, or less expensive." *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 282 F.R.D. 259, 262-263 (N.D. Cal. 2012) (cits. & quots. omitted). In deciding whether to allow an "apex deposition," courts should, among other things, consider "whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case" and whether the party seeking the deposition has exhausted other less intrusive discovery methods. *Id*. at 263 (cits. omitted).

**B. Mr. Elliott is an apex witness.**

Courts often find that corporate "Senior Vice Presidents" qualify as apex witnesses in the first instance. *Groupion, LLC v. Groupon, Inc.*, 2012 WL 359699 (N.D. Cal. February 2, 2012) (barring apex depositions of, among others, "four Senior Vice Presidents"). This includes the insurance setting. For example, the

court in *PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Trust Midas Life Settlements LLC*, 2012 WL 12896244 (D. Minn. September 21, 2012), applied the apex doctrine to bar the deposition of Polkinghorn, "one of" the "Senior Vice Presidents" of the plaintiff insurer's parent company, Phoenix. *Id*. at * 5. The Court also barred the deposition of Shaeffer, the parent company's former Regional Vice President of Life Sales. *Id*. Even though Schaeffer was "no longer a Phoenix employee" such that "the argument he is an apex deponent rings hollow," the court nevertheless precluded his deposition because the opposing party had "ample opportunity to obtain the information" from other non-apex sources. *Id*.

Likewise, in *Int'l Game Technology v. Illinois Nat'l Ins. Co.*, 2018 WL 7499823 (D. Nev. April 6, 2018), the court agreed that the "Global Head of Financial Lines, Specialty Claims" for the defendant insurer's claims administrator was an apex employee. *Id*. at * 2. In *Canales v. American Security Life Ins. Co.*, 2010 WL 11629029 (M.D. Fla. April 28, 2010), an insured sought to depose his insurance company's "Claims Director," Collazo, and its "Vice President of Claims," Kroll. Though it denied the insurer's motion for a protective order, the court "agree[d] with" the insurer in the first instance "that Ms. Collazo and Mr. Kroll are apex witnesses." *Id*. at *2.

Just like Mr. Kroll in *Canales*, Mr. Elliott's title is Senior Vice President of Claims, meaning he is generally "the sole head of all insurance claims in the United States of America for" every one of Global Indemnity Group, LLC's subsidiary insurers. (Elliott Decl., ¶ 7.) Mr. Elliott sits on United National's board of directors (*id*. at ¶ 2), and directly reports to the CEO of Global Indemnity Group, LLC. (*Id*. at ¶ 8.) Mr. Elliott's role is thus comparable to that of the apex witness from *Ellena v. Standard Ins. Co.*, 2013 WL 4520200 (N.D. Cal. August 23, 2013), the Vice President of a defendant insurer's corporate parent who "reports directly to the CEO." *Id*. at * 1. His role is likewise akin to the apex employee

from *Klungvedt v. Unum Group*, 2013 WL 551473 (D. Ariz. February 13, 2013), the defendant life insurer's "Executive Vice President of Individual Disability and Long Term Care Closed Block Operations." *Id*. at *1 (noting that only the "President/CEO rank[ed] above" the Vice President).

To be sure, courts sometimes disagree that high-ranking claims personnel are apex employees. But those courts generally do so when insurers seeking a protective order offer no evidence shedding light on the deponent's actual role or responsibilities. For example, in *Dobson v. Twin City Fire Ins. Co.*, 2011 WL 6179154 (C.D. Cal. December 11, 2011), the court declined to bar deposition of the insurer's "Vice President of Claims" because "no showing has been made to explain Mr. Goldstein's role in the organization" and "[t]he Court will not infer that he is an apex witness based solely on his title as Vice President of Claims." *Id*. at * 6. Likewise, the court in *Lexington Ins. Co. v. Sentry Select Ins. Co.*, 2009 WL 4885173 (E.D. Cal. December 17, 2009) rejected Sentry's argument that its "Director of Corporate Claims," its "Vice President of Corporate Claims," and its "Senior Director of Corporate Claims" were apex witnesses because "Sentry has not provided this Court with any information other than the titles assigned or previously assigned to" the three individuals "and simply asserts they 'are or were high-level executives at Sentry.' " *Id*. at * 7.

Here, in contrast, United National's motion papers include a declaration from Mr. Elliott in which he lays out his role and responsibilities in detail. He sits on United National's corporate board of directors. (Elliott Decl., ¶ 2.) He is employed as the "Senior Vice President of Claims" by Global Indemnity Group Services, LLC, a subsidiary of a publicly-traded holding company named Global Indemnity Group, LLC, of which United National and multiple other insurance companies are likewise wholly owned subsidiaries. (*Id*. at ¶¶ 3-4, 6.) Mr. Elliott's immediate superior to whom he reports is Global Indemnity Group, LLC's, CEO, David Charlton. (*Id*. at ¶ 8.) As Senior Vice President of Claims, Mr. Elliott meets

with Mr. Charlton and Global Indemnity Group, LLC's board of directors once per quarter to discuss revenues and losses, catastrophic loss claims, mergers and acquisitions, possible sales of existing business lines, and other executive-level business matters such as treaty and facultative reinsurance. (*Id*. at ¶ 9.)

Further, Global Indemnity Group, LLC's subsidiary insurance companies issue policies in all fifty United States, and Mr. Elliott's role as Senior Vice President of Claims means he is the sole head of all insurance claims—first party, third party, and reinsurance—for these companies on a nationwide basis. (*Id*. at ¶¶ 3-5, 7.) His day-to-day job duties, then, "do not entail the handling of, or active participation in the handling of, insurance claims." (*Id*. at ¶ 11.) Instead, his responsibilities generally entail executive-level conduct such as "reviewing proposals for new lines of business, participating in claims audits (i.e., systematic and detailed reviews of the claims department), consulting on mergers, acquisitions, and potential business sales, and dealing with company-wide staffing issues and decisions." (*Id*. at ¶ 10.)

These are not the duties of an insurance company's lower-level employee outside the reach of the apex doctrine. They are the responsibilities of a high-level official whom the doctrine is designed to protect. Mr. Elliott is an apex employee in the first instance.

**C. Mr. Elliott has no unique first-hand, non-repetitive knowledge of the facts at issue in the case.**

As this Court has observed, the party invoking the apex doctrine "must first demonstrate that he or is she is a high-ranking official." *Cannavan v. County of Ventura*, 2021 WL 4945186 * 6 (C.D. Cal. July 16, 2021) (quots. omitted.) "Once that is shown," however, "the burden shifts to the party seeking the deposition to show that the high-ranking official has unique, first-hand knowledge of facts essential to the case and that the information cannot be obtained through other means." *Id*. (cits. omitted.) So, here, because "the apex doctrine applies to" Mr.

Elliott in the first instance, "to take his deposition, Plaintiffs must establish that he possesses unique, first-hand knowledge of facts relevant to this action and that the information he possesses is not available from other sources." *Id*. at * 7. And along these same lines, plaintiffs' "purpose to harass or annoy may be inferred where there is no showing" that Mr. Elliott "has relevant and personal knowledge about the facts at issue." *Estate of Levingston v. County of Kern*, 320 F.R.D. 520, 527 (E.D. Cal. 2017).

Plaintiffs, for their part, have never challenged the notion that Mr. Elliott "is removed from the daily subjects of [this] litigation" (*K.C.R. v. County of Los Angeles*, 2014 WL 3434257 * 4 (C.D. Cal. July 11, 2014)), i.e., United National's handling and adjustment of insurance claims. Nor can they. Not only do plaintiffs lack any evidence to the contrary, Mr. Elliott's declaration confirms that while his "day-to-day responsibilities as Senior Vice President of Claims" do involve executive-level business activities like mergers and acquisitions, company-wide staffing and personnel decisions, and engaging in proposals for new lines of business (Elliott Decl., ¶ 10), they "do **not** entail the handling of, or active participation in the handling of, insurance claims." (*Id*. at ¶ 11, bold emph. added.) The point is beyond dispute.

Plaintiffs nevertheless maintain that Mr. Elliott somehow obtained unique personal knowledge of relevant facts. As described in their position statement in the parties' joint email to the Court (mirroring the arguments in their November 8, 2021, letter to United National attached as Exhibit D to the Katibah Declaration):

> (2) the claims handler on this file (Randi Hoffman) testified that Mr. Elliott had 'final say' on claim decisions; (3) United National has produced communications regarding Plaintiffs' claim from Ms. Hoffman to Mr. Elliott, entitling Plaintiffs to inquire as to any discussions they had and Mr. Elliott's thoughts regarding the issues they discussed; [and] (4) Mr. Elliott knows

the extent to which he approved the handling of Plaintiffs' claim, and also the policies and procedures that he developed and/or maintained for the claims department he oversees.

We rebut these points seriatim.

*i.* *<u>Mr. Elliott's "final say" on claims decisions</u>*.

In July 2021, plaintiffs deposed Ms. Hoffman. (Katibah Decl. ¶ 8.) Their counsel asked Ms. Hoffman whether "in making decisions regarding the claims you were handling"—meaning insurance claims generally—"did you have full discretion to make those decisions?" (*Id*. at Exh. F [Hoffman transcript], Bates No. 028, Depo. p. 49, lines 10-13.) She answered "No. I had a lot of discretion, but – but Mark DiGiovanni had final say, and then above that, Dave Elliott had final say." (*Id*. at lines 14-16.) This is the only time Ms. Hoffman mentioned Mr. Elliott having "final say" over claims, and her testimony does not suggest that Mr. Elliott commonly *exercises* "final say," let alone that he did so in this case. What Ms. Hoffman said merely harmonizes with Mr. Elliott's own attestation that he is the "sole head of all insurance claims in the United States for Global Indemnity Group, LLC's subsidiary insurance companies," including United National. (Elliott Decl., ¶ 7.) Put differently, Mr. Elliott has authority to overrule any claim-handling decision made by anyone else.

If that authority were enough to defeat this motion, Mr. Elliott would be subject to a deposition every time United National or the other Global Indemnity Group, LLC, insurance companies become involved in claims litigation anywhere in the United States. This Court recently recognized that "[t]his is precisely the potential abuse that the apex doctrine is intended to prevent." *Cannavan,* 2021 WL 4945186 at * 7. In other words, because "high level executives are vulnerable to numerous, repetitive, harassing, and abusive depositions," they "therefore need some measure of protection from the courts." *PHL Variable Ins. Co.*, *supra*, 2012 WL 12896244 * 4 (cits. & quots. omitted.)

Mr. Elliott has, in any event, declared that "I was not asked to participate in, approve of, or overrule any of the claim-handling decisions at issue in this lawsuit of *L.A. Terminals, Inc., et al. v. United National Insurance Company*, C.D. Cal. No. 8:19-cv-00286-ODW-PVC." (Elliott Decl., ¶ 12.)

That he did not actually exercise "final say" here was further confirmed in United National's Rule 30(b)(6) deposition. United National produced Mark DiGiovanni, the claim department's Vice President of Litigation Management and Ms. Hoffman's former supervisor, as its witness. Plaintiffs' counsel asked (we discuss counsel's full colloquy with Mr. DiGiovanni about Mr. Elliott later on) Mr. DiGiovanni:

- Whether Mr. Elliott had "any role whatsoever in handling plaintiffs' claim for insurance?" Mr. DiGiovanni said he "would have reported to him periodically on it, like I do on every claim. But other than that, no." (Katibah Decl., ¶ 9, Exh. G [DiGiovanni transcript], Bates No. 034, Depo p. 31, lines 14-18.)

- "So … he agreed with the decision, for example, to deny LAT's claim for insurance; correct?" "Was Elliott involved at that juncture. I don't know. Probably not. I don't remember." (*Id*. at Bates No. 035, Depo. p. 32, line 20 to Bates No. 036, Depo. p. 33, line 4.)

- "Was Mr. Elliott involved in any capacity in th[e] decision to deny LAT's claim for insurance?" "No." (*Id*. at Bates No. 036, Depo. p. 33, lines 9-11.)

- "When you say 'not necessarily' involved, was Mr. Elliott involved at that stage in United National's determination in August of 2018 to deny LAT's claim for insurance?" "I don't believe so … [o]ther than me probably telling him what had happened, no." (*Id*. at Bates No. 037, Depo. p. 34, line 17 to Bates No. 038, Depo. p. 35, line 1.)

- "Same question for United National's decision to defend" another party, the City of Los Angeles, "in September of 2018. Do you have a specific recollection of whether Mr. Elliott was involved in that decision?" "I do

not." (*Id*. at Bates no. 039, Depo. p. 36, lines 11-16.) [2]

- "[D]id David Elliott approve United National's decision to defend the City?" "I approved it, and I'm sure I would have advised him that I approved it, yes." (*Id*. at Bates no. 058, Depo. p. 214, lines 14-17.)

- "How about Mr. Elliott? Did he review this [April 2019 reservation of rights] letter?" "I wouldn't think so, no." (*Id*. at Bates No. 063, Depo. p. 274, lines 11-13.)

None of this suggests that Mr. Elliott has any "*unique* and personal knowledge related to these issues which makes his deposition more than marginally relevant and enough to outweigh the burden" because there is nothing "to suggest that some evidence has been discovered to support [plaintiffs'] argument that [Mr. Elliott] has unique knowledge related to the issues at hand." *Klungvedt v. Unum Group*, 2013 WL 551473 (D. Ariz. February 13, 2013) (ital. orig.)

*ii.* *<u>Communications between Ms. Hoffman and Mr. Elliott.</u>*

In May 2019, United National produced documents responsive to plaintiffs' first set of requests for production. (Katibah Decl., ¶ 7.) At Bates no. UNIC 083 of the production, United National produced an April 5, 2019, email from Ms. Hoffman to Mr. Elliott telling him what the claim number was, what the applicable policy limits were, who reinsured the policies, and asking Mr. Elliot to "[p]lease let me know if you have questions or would like to discuss any aspect of this file." (*Id*. at Exh. E, Bates No. 019.) This is the only evidence of "communications regarding Plaintiffs' claim that were sent from Ms. Hoffman to Mr. Elliott" that plaintiffs identified in their November 8, 2021, letter to United National. (Katibah Decl., ¶ 6, Exh. D, Bates No. 015.) Likewise, the email is, to United National's

[2] United National is unaware of a single document produced to plaintiffs in discovery suggesting that Mr. Elliott was at all involved in United National's decision to defend the City of Los Angeles against the same underlying lawsuits.

knowledge, the only document produced in this litigation reflecting any communication between Ms. Hoffman and Mr. Elliott.

When plaintiffs deposed Ms. Hoffman in July 2021, more than two years after obtaining the email, they did not ask her about it or introduce it as an exhibit. (Katibah Decl., Exh. F [Hoffman transcript], Bates Nos. 023-024, Depo. pp. 3-4 [page showing exhibits].) Indeed, plaintiffs never asked Ms. Hoffman whether she had communicated with Mr. Elliott about their insurance claims at all, despite the April 5, 2019, email expressly telling Mr. Elliott to "let me [Ms. Hoffman] know if you have questions or would like to discuss any aspect of this file." Instead, plaintiffs asked Ms. Hoffman the following questions, and only the following questions, about Mr. Elliott and so received only the following answers:

- Whether Mark DiGiovanni was Ms. Hoffman's "direct supervisor" and whether Mr. DiGiovanni "reported directly to David Elliott?" Ms. Hoffman said "Yes." (Katibah Decl., Exh. F [Hoffman transcript], Bates No. 025, Depo. p. 46, lines 9-21.)

- Whether Mr. Elliott's "title has changed from Senior Vice President of Claims" since Ms. Hoffman left the company in 2020. Ms. Hoffman said "[n]o, I don't think so." (*Id*. at lines 22-25.)

- "And did you ever discuss claims with David Elliott?" Ms. Hoffman answered "[f]rom time to time." (*Id*. at Bates no. 026, Depo p. 47, lines 16-18.)

- "Under what circumstances would you discuss claims with David Elliott?" "If an issue came up that I wanted to discuss with him or if he asked me a question about a specific claim." (*Id*. at lines 19-23.)

- "Do you recall what types of claims you might have felt it was necessary to discuss with David?" "No, I mean, I don't recall anything specific." (*Id*. at Bates no. 026, Depo p. 47, line 24 to Bates No. 027, Depo p. 48, lines 3)

- Whether it was Ms. Hoffman's "understanding" that her discussions with Messrs. DiGiovanni and Elliott about claims generally "were

privileged?" Ms. Hoffman answered "[n]ot – not privileged in the sense of the attorney-client privilege." (*Id*. at Bates no. 027, Depo. p. 48, line 5 to Bates No. 028, Depo. P. 49, line 7.)

- Whether Ms. Hoffman had "full discretion" to make claim-handling decisions, to which Ms. Hoffman answered that while she "had a lot of discretion," Mr. DiGiovanni "had final say" above her and that Mr. Elliott "had final say" above Mr. DiGiovanni. (*Id*. at Bates No. 028, Depo. P. 49, lines 10-16.)

Plaintiffs, then, cannot credibly maintain their point from the joint email to the Court or their challenge letter to United National that the April 2019 Hoffman/Elliott email "entitl[es]" them to depose *Mr. Elliott* in order "to inquire as to any discussions [he and Ms. Hoffman] had and Mr. Elliott's thoughts regarding the issues they discussed." The apex doctrine, after all, requires that the apex employee possess "factual information pertaining to material issues in an action" that "is not available through any other source." *Church of Scientology of Boston v. I.R.S.*, 138 F.R.D. 9, 12 (D. Mass. 1990). Ms. Hoffman was just such an "other source." That plaintiffs did not "make a good faith effort to extract the information [they] seek[] from" her deposition"—they made no effort at all—does not permit them to now ask such questions of the apex individual, Mr. Elliott. *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067 * 5 (N.D. Cal. January 25, 2007).

*iii.* *"Mr. Elliott knows the extent to which he approved the handling of Plaintiffs' claim" and "the policies and procedures that he developed and/or maintained for the claims department he oversees."*

Regarding plaintiffs' conclusion that Mr. Elliott can be deposed about "the policies and procedures that he developed and/or maintained for the claims department he oversees," the Court should note that United National produced the Global Indemnity "Claims Manual or Best Practices" manual in discovery (under a

confidentiality designation) and that plaintiffs' counsel comprehensively interrogated Mr. DiGiovanni about the document in United National's Rule 30(b)(6) deposition. (Katibah Decl., ¶ 9, Exh. G [DiGiovanni transcript], at Bates nos. 043-056, 059-062, Depo. pp. 57-60, 66-67, 105-112, 216-219.) Plaintiffs, moreover, have adduced no evidence suggesting, and thus have no apparent reason to believe, that Mr. Elliott "developed and/or maintained" his own discrete "policies and procedures" for handling insurance claims. They are just begging their own question.

Plaintiffs further speculate by insinuating Mr. Elliott alone has unique knowledge about "the extent to which he approved the handling of Plaintiffs' claim." Plaintiffs, again, never bothered to ask Ms. Hoffman whether she talked to Mr. Elliott about the claim or whether he "approved" of any claim decisions. And Mr. Elliott's declaration refutes the idea in any event: "I had no involvement in, and was not asked by anyone to participate in, approve of, or overrule any of the claim-handling decisions at issue in this lawsuit of *L.A. Terminals, Inc., et al. v. United National Insurance Company*, C.D. Cal. No. 8:19-cv-00286-ODW-PVC." (Elliott Decl., ¶ 12.)

In United National's Rule 30(b)(6) deposition, moreover, plaintiffs' counsel extensively questioned Mr. DiGiovanni about Mr. Elliott's role in the disputed insurance claims.[3] Mr. DiGiovanni's answers nevertheless confirmed Mr. Elliott's lack of any active role or unique, non-repetitive information subject to discovery. Summarized here, plaintiffs' counsel asked Mr. DiGiovanni the following questions about Mr. Elliott and received the following answers:

- Whether Mr. Elliott had "any role whatsoever in handling plaintiffs' claim for insurance?" Mr. DiGiovanni said he "would have reported to him periodically on it, like I do on every claim. But other than that,

[3] Counsel asked these questions despite the deposition notice containing nothing suggesting Mr. Elliott would be a topic of questioning. (See Katibah Decl., ¶ 10, Exh. H.)

no." (Katibah Decl., ¶ 9, Exh. G [DiGiovanni transcript], Bates No. 034, Depo p. 31, lines 14-18.)

- "[D]id Mr. Elliott provide any advice or guidance or approval regarding decisions that United National made with respect to plaintiffs' claim for insurance? "Well, on every claim, I keep him updated, and he – he approves what was going on. But it was myself and primarily Randi Hoffman who were handling the claim initially." (*Id*. at Bates no. 034, Depo p. 31, line 25 to Bates no. 035, Depo. p. 32, line 11.)

- "Would you agree that David Elliott had final say on United National's handling of plaintiffs' claim for insurance?" "Well, this was within my authority, and I made the decisions, and he agreed. Beyond that …" (*Id*. at Bates no. 035, Depo. p. 32, lines 13-19.)

- "So … he agreed with the decision, for example, to deny LAT's claim for insurance; correct?" "Well, originally, LAT's claim was denied, and I was dealing with Ms. Hoffman. We asked for LAT for information – additional information to help us further assess the claim, if any existed. We never got a response. Was Elliott involved at that juncture? I don't know. Probably not. I don't remember." (*Id*. at Bates No. 035, Depo p. 32, line 20 to Bates No. 036, Depo. p. 33, line 4.)

- "Did Mr. Elliott approve the – in approximately August of 2019, United National denied LAT's claim for insurance; correct?" "Yes." (*Id*. at Bates no. 036, Depo. p. 33, lines 5-8.) "Was Mr. Elliott involved in any capacity in that decision to deny LAT's claim for insurance?" "No." (*Id*. at lines 9-11.)

- "Did you consult him on the decision to deny LAT's claim for insurance?" "My usual practice was always to consult him because he's the head of the department, but I can't say specifically that I did or didn't." (*Id*. at lines 12-16.)

- "He – has authority to override any decision that you make; correct?" "Yes. He's the head of the department." (*Id*. at lines 17-19.)

- "So you, prior to making a final determination, run that determination by Mr. Elliott to ensure that he isn't going to veto it; correct?" "Yeah,

the procedure would be … Randi Hoffman … would make a determination on a case like this … would send it to me for review or approval … [a]nd we would make a decision, and that would be that … Elliott would not necessarily be involved at that stage." (*Id*. at Bates no. 036, Depo. p. 33, line 20 to Bates no. 037, Depo. p. 34, line 16.)

- "When you say 'not necessarily' involved, was Mr. Elliott involved at that stage in United National's determination in August of 2018 to deny LAT's claim for insurance?" "I don't believe so." (*Id*. at Bates no. 037, Depo. p. 34, lines 17-21.)

- "And as the representative of the company, was Mr. Elliott involved?" "Other than me probably telling him what had happened, no. Ms. Hoffman made the determination. I reviewed her provisional disclaimer and approved it. That's all that needed to be done at that point." (*Id*. at Bates no. 037, Depo. p. 34, line 23 to Bates no. 038, Depo. p. 35, line 3.)

- "In preparing for this deposition, did you look back on notes or e-mails to determine if Mr. Elliott was involved in the determination to deny plaintiff – LAT's claim for insurance in August 2018?" "No." (*Id*. at Bates No. 038, Depo. p. 35, lines 4-8.)

- "So you don't know one way or the other?" "The procedure would be in a circumstance like this, the senior environmental attorney would complete a review, review the pleadings, review the complaint. And then she would send a recommendation to me, and I would approve it." (*Id*. at lines 9-21.)

- "I'm not asking of the – the normal procedure. I'm simply asking whether you know one way or the other whether the decision to deny LAT's claim for insurance in August 2018, whether that decision was run by Mr. Elliott for his approval or disapproval?" "It was my decision. My general practice would always be to talk to him daily, but I have no specific recollection." (*Id*. at Bates no. 038, Depo. p. 35, line 23 to Bates no. 039, Depo. p. 36, line 6.)

- "And you would talk to him daily? That was your practice?" "Yes." (*Id*. at Bates no. 039, Depo. p. 36, lines 8-10.)

- "Same question for United National's decision to defend" another party, the City of Los Angeles, "in September of 2018. Do you have a specific recollection of whether Mr. Elliott was involved in that decision?" "I do not." (*Id*. at lines 11-16.)

- "But the same general protocol would apply, that that you spoke with him daily about the matters you were handling?" "Yes." (*Id*. at lines 17-20.)

- That he—Mr. DiGiovanni—had not discussed the Rule 30(b)(6) deposition with Mr. Elliott because "Mr. Elliott would have less information than I have" (*Id*. at Bates no. 040, Depo. p. 42, line 21 to Bates no. 041, Depo. p. 43, line 22) and that he wouldn't know if Mr. Elliott "spoke about the claim with another employee" "unless he happened to tell me at the time." (*Id*. at Bates no. 042, Depo. p. 44, lines 8-14.)

- Whether Mr. Elliott "review[ed] the [disclaimer] letter before [Ms. Hoffman] sent it?" "No. He wouldn't be involved at that point" such that it is "highly doubtful" that Mr. Elliott would have reviewed it. (*Id*. at Bates no. 057, Depo. p. 141, lines 5-13.)

- "[D]id David Elliott approve United National's decision to defend the City?" "I approved it, and I'm sure I would have advised him that I approved it, yes." (*Id*. at Bates no. 058, Depo. p. 214, lines 13-17.)

- Asking about an April 2019 reservation of rights letter to L.A. Terminals, "[h]ow about Mr. Elliott? Did he review this letter?" "I wouldn't think so, no." (*Id*. at Bates no. 063, Depo. p. 274, lines 11-13.)

- "Was he made aware that United National was purporting to change a coverage position that it had issued in August of 2018?" "Yes." (*Id*. at lines 14-17.)

- "So he was aware that – that United National was changing its coverage position?" "Yes, based on new information that had been received, yes." (*Id*. at lines 18-21.)

- "Did he approve that change of coverage position?" "Are you asking, did I specifically have a conversation with him, and did he – yes, he

tacitly approved it. I made the decision and it was approved. I would have discussed it with him and he would have approved it." (*Id*. at Bates no. 063, Depo p. 274, line 22 to Bates no. 064, Depo. p. 275, line 3.)

- Did he ask why United National was changing its coverage position?" "I don't recall the specific conversation." (*Id*. at Bates no. 064, Depo. p. 275, lines 4-6.)

- That he—Mr. DiGiovanni—would not personally have entered his conversations into the file's claim notes because his conversations with Mr. Elliott would have "include[d] Randi Hoffman, and she would make the entry." (*Id*. at Bates no. 065, Depo. p. 276, lines 2-24.)

- "Do you ever – did you ever speak with Mr. Elliott about cases without the claim handler in the conversation?" "I've had thousands of conversations with Mr. Elliott over 13 years. Some include the examiner and some don't." (*Id*. at Bates no. 065, Depo. p. 276, line 25 to Bates no. 066, Depo. p. 277, line 12.)

- If the examiner was not present for an "environmental file" discussion with Mr. Elliott, Mr. DiGiovanni "would then speak to the examiner and say, We've had a discussion, and this is what needs to be put in the file to update the file." (*Id*. at Bates no. 066, Depo. p. 277, lines 18-25.)

These exchanges show that Mr. Elliott was not actually involved in the handling of plaintiffs' insurance claims (just like he attested in his declaration); that the final claim decisions were Mr. DiGiovanni's decisions and that Mr. DiGiovanni had authority to make them; that Mr. Elliott was aware of the claims because Mr. DiGiovanni makes it his practice to keep his superior apprised of all claims he is handling; that Mr. Elliott "tacitly" approved of Ms. Hoffman's and Mr. DiGiovanni's claim-handling decisions (by never overruling them, consistent with Mr. Elliott's declaration); and that Mr. Elliott would not have reviewed United National's various coverage letters to plaintiffs.

In short, there is no reason to conclude from any of Mr. DiGiovanni's testimony (or any other evidence) that Mr. Elliott has non-repetitive "first-hand knowledge of facts *essential* to the case," let alone "*unique*" essential knowledge. *Cannavan*, 2021 WL 4945186 at * 6 (ital. added.) Anything Mr. Elliott can be said to know about the claims is entirely encompassed within what Mr. DiGiovanni and Ms. Hoffman—the people who actively handled the claims—know and have already testified about.

Even if the Court disagrees, moreover, the key question would still be whether Mr. Elliott's knowledge (assuming any) is "more than marginally relevant and enough to outweigh the burden of the discovery." *Int'l Game Technology v. Illinois Nat'l Ins. Co.*, 2018 WL 7499823 (D. Nev. April 6, 2018). That is plaintiffs' showing to make, but nothing in their section of this joint stipulation even attempts to make it.

**D. Plaintiffs did not exhaust all less intrusive means of discovery.**

Even if an apex witness has "unique personal knowledge," the apex rule generally still generally bars his or her deposition if information about the knowledge is "unavailable from less intrusive discovery, including interrogatories and the depositions of lower level employees." *Afinity Labs of Texas v. Apple, Inc.*, 2011 WL 1753982 * 6 (N.D. Cal. May 9, 2011). This does not mean, however, that the deposing party may simply go through the motions and "take half-hearted depositions of lower level employees in order to set up an opportunity to depose" the apex witness. *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067 * 5 (N.D. Cal. January 25, 2007). Rather, the party "must make a good faith effort to extract the information it seeks from interrogatories and depositions of lower-level … employees." *Id.*

Here, as discussed, plaintiffs could have discovered much of the information they claim to need had they more thoroughly deposed Ms. Hoffman. Their failure to do that does not now justify forcing Mr. Elliott to sit for a deposition about

previously-available information that plaintiffs ignored.

Plaintiffs have also known since June 2021, when United National's attorneys produced (subject to protective order) a personnel chart for the claims department at Global Indemnity (Katibah Decl., ¶ 12) that Mr. Elliott is the Senior Vice President of Claims. (*Id*. at ¶ 8, Exh. F, Bates no. 023, Depo. p. 3 [portion Hoffman transcript listing deposition exhibits; see Exh. 2])

Coupled with their knowledge of Mr. Elliott's identity from the April 2019 email produced in May 2019 (Katibah Decl., ¶ 7, Exh. E), plaintiffs could thus have served additional interrogatories or requests for admission geared towards Mr. Elliott's purported involvement and role before, or even after, deposing Ms. Hoffman. Doing so would have been "far less burdensome than the deposition of" Mr. Elliott. *Affinity Labs*, 2011 WL 1753982 * 10. Such procedures also would have ensured plaintiffs' rights were "fully protected as well as those of Mr." Elliott because plaintiffs could have noticed "a subsequent oral deposition if the answers to the interrogatories so warrant[ed]" *or* "if the answers are shown to be insufficient[.]" *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D. RI 1985). In short, plaintiffs "could have—and should have under the apex doctrine—served" targeted "interrogatories well before the close of fact discovery." *Affinity Labs*, 2011 WL 1753982 * 10.

Plaintiffs did not. The only written discovery they served from June 2021 to the close of discovery was a set of four contention interrogatories asking United National to disclose the facts supporting certain affirmative defenses in its answer. (Katibah Decl., ¶ 13, Exh. J, Bates nos. 090-091.) The Court should not reward plaintiffs' failure to diligently pursue written discovery targeting towards discovering Mr. Elliott's purported role in and knowledge of the relevant facts here.

**2. <u>Plaintiffs' position</u>.**

**A. United National has not carried its "heavy burden" of demonstrating that Mr. Elliott should be exempt from deposition.**

United National portrays Mr. Elliott as an executive too enmeshed in "big picture" issues to be involved in the day-to-day claims handling of the department he runs. (*See, e.g.*, Elliott Decl. at ¶ 11 ("My day-to-day responsibilities as Senior Vice President of Claims do not entail the handling of, or active participation in the handling of, insurance claims.").) However, within the deposition transcript passages quoted by United National are statements that undercut this narrative. For example, Mr. DiGiovanni – who reports directly to Mr. Elliott – testified regarding his frequent interactions with Mr. Elliott regarding claims handling as follows:

- "on every claim, I keep him updated and he – he approves what was going on." (UN Ex. G at 31:25-32:11.)
- "My usual practice was to always consult him" (*Id.* at 33:12-16.)
- "My general practice would always be talk to him daily" (*Id.* at 35:23-36:6.)

Mr. DiGiovanni's direct report, Ms. Hoffman, testified that even she spoke directly with Mr. Elliott "[f]rom time to time" about claims she was handling "[i]f an issue came up that I wanted to discuss with him or if he asked me a question about a specific claim." (UN Ex. F at 47:16-23.)

Such involvement is contrary to Mr. Elliott's declaration, and undermines the claim that he is an "apex" executive in the first instance. *See generally Apple Inc. v. Samsung Electronics, Ltd.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("on the proverbial sliding scale, the closer that a proposed witness is to the apex of some particular peak in the corporate mountain range, and the less directly relevant that person is to the evidence proffered in support of his deposition, the more appropriate the protections of the apex doctrine become.").

But even if he is an "apex" executive, that is only the beginning of the analysis. In *Apple*, the court ordered two- and three-hour depositions of several executives notwithstanding their invocation of the "apex" doctrine, explaining the "heavy burden" on the party opposing the deposition as follows:

> In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." However, "a party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." Thus, it is very unusual "for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances." "When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." "A claimed lack of knowledge, by itself it is insufficient to preclude a deposition."

282 F.R.D. at 263 (emphasis added; citations omitted).

United National has not carried its heavy burden as there certainly are no extraordinary circumstances justifying Mr. Elliott being exempt from deposition. That, standing alone, necessitates denying United National's motion.

Moreover, Plaintiffs' intention to depose Mr. Elliott for a couple of hours via remote videoconferencing is patently reasonable and proportional to the needs of this case. Mr. Elliott was the direct supervisor of Mr. DiGiovanni, whom United National designated as its Rule 30(b)(6) witness, and he was also the indirect supervisor of claims handler Ms. Hoffman, who handled Plaintiffs' claim and authored the coverage letters at issue in this case.

Facts developed in discovery suggest that Mr. Elliott has unique and personal knowledge regarding the handling of Plaintiffs' insurance claim. Ms. Hoffman testified that she discussed claims with Mr. Elliott and that he had "final say." (UN Ex. F at 46:13-21, 47:16-23, 49:10-24.) Additionally, while Mr. DiGiovanni could not recall specifics (and the claim file also sheds no light), Mr. DiGiovanni testified that, pursuant to his standard practice "to always consult [Mr.

Elliott] because he's the head of the department," Mr. DiGiovanni would have advised Mr. Elliott regarding coverage determinations that are at issue *in this lawsuit*. Mr. DiGiovanni testified that:

- With respect to United National's decision to defend the City of Los Angeles (while denying a defense to LAT), "I'm sure I would have advised him that I approved it, yes." (UN Ex. G at 214:14-17.)
- With respect to United National's handling of Plaintiffs' claim for insurance: "Well, this was within my authority, and I made the decisions, and he agreed." (*Id*. at 32:13-19.)
- With respect to the coverage letter sent to Plaintiffs in April 2019, Mr. Elliot "[w]as made aware that United National was purporting to change a coverage position that it had issued in August of 2018." (*Id*. at 274:14-21.)
- Moreover, with respect to that decision, Mr. Elliott "tacitly approved it. I made the decision and it was approved. I would have discussed it with him and he would have approved it." (*Id*. at 274:22-275:3.)

Additionally, United National has produced an April 5, 2019 email from Ms. Hoffman to Mr. Elliott, referring to a discussion they had regarding the policies that Plaintiffs purchased and stating, "Please let me know if you have questions or would like to discuss any aspect of this file." (Ex. E, UNIC 0083.) The timing of this email is noteworthy because it came just one week before United National issued a April 12, 2019 letter that changed its earlier coverage denial.

As the person who was ultimately responsible for United National's coverage positions and approved decisions regarding the handling of Plaintiffs' insurance claim, Plaintiffs should be permitted to depose Mr. Elliott on his involvement in those decisions. Plaintiffs are entitled to know, for example, what Ms. Hoffman and/or Mr. DiGiovanni may have discussed with Mr. Elliott regarding Plaintiffs' claim for coverage regarding the underlying actions, the extent to which Mr. Elliott approved any aspect of Ms. Hoffman's handling of Plaintiffs' claim, and the practices and procedures that Mr. Elliott developed and/or

maintained for the claims department he oversees at United National.[4]

As stated in the legal standard above, Mr. Elliott's contrary declaration that he had "no involvement" in Plaintiffs' claim does not shield him from being deposed. Indeed, given the above facts, his statements should be subjected to cross-examination and documents to refresh his recollection.[5] Moreover, as the person with "final say" over claim decisions, he is uniquely positioned to testify as to the policies, practices, and procedures that United National's claims handlers were supposed to follow.[6]

A California federal court rejected similar assertions that the apex doctrine should prevent the depositions of the insurer's Director of Corporate Claims who had "received only nine emails" concerning the claim, its former Vice President of Corporate Claims who had "received approximately eleven items of email correspondence and responded to one" regarding the claim, and its Senior Director of Corporate Claims who had received and responded to relevant emails. *Lexington Ins. Co. v. Sentry Select Ins. Co*., 2009 WL 4885173, at *6 (E.D. Cal. Dec. 17, 2009). The court noted that "'[t]he mere fact . . . that other witnesses may be able to testify as to what occurred at a particular time or place does not mean

---

[4] As noted, Mr. DiGiovanni testified that if the claims examiner (Ms. Hoffman) was not a party to his conversations with Mr. Elliott, it would only be reflected in the claim notes if Mr. DiGiovanni went to Ms. Hoffman and told her what needs to be put in the claim notes regarding the conversation, making Mr. Elliott's unfiltered, independent recollection all the more important. (Jackson Decl., Ex. N at 277:10-21.)

[5] Even if Mr. Elliott ultimately confirms that he was not involved, this itself indicates a lack of oversight at United National, given that Mr. Elliott claims to have not been involved even after this lawsuit was filed and to this day has never reviewed the coverage letters that are at issue. (Elliott Decl. at ¶¶ 12-14).

[6] United National's complaint that Plaintiffs have not provided additional evidence of Mr. Elliott's involvement in Plaintiffs' claim is disingenuous in light of the heavy redactions to virtually all of its production of documents. Nor should the Court prefer quantity over quality of the evidence offered – the deposition testimony and email highlighted clearly indicate that Mr. Elliott was involved in the handling of Plaintiffs' claim, even if he currently does not recall as much without the benefit of having his memory refreshed through documents.

that a high level corporate officer's testimony would be 'repetitive.' Indeed, it is not uncommon for different witnesses to an event to have differing recollections of what occurred." *Id*. at *7 (citation omitted); *see also JMIC Life Ins. Co. v. Henry*, 922 So. 2d 998, 1001 (Fla. Dist. Ct. App. 2005) (rejecting similar assertions by an insurer that the apex doctrine applies regarding a vice president of its claims department, in part, because the vice president was "ultimately responsible" for the denial of insured's claim).

California federal courts have routinely determined that the apex doctrine is not a safe haven for company executives that may have knowledge regarding certain practices and procedures relevant to the litigation. *See, e.g.*, *Rosales v. FitFlop USA, LLC*, 2013 WL 12416060, at *5 (S.D. Cal. Jan. 4, 2013) (permitting deposition of CEO, where she was believed to have, among other things, "unique, first-hand knowledge as to how customer complaints about FitFlop Footwear were handled during the class period"); *Hunt v. Cont'l Cas. Co*., 2015 WL 1518067, at *3 (N.D. Cal. Apr. 3, 2015) ("The Court does not doubt that Mr. [Morin] is a busy person with substantial responsibilities. But that fact does not control where, as here, there is a substantial basis to believe that he may have relevant information to which Plaintiff is entitled under the Federal Rules."); *Finisar Corp. v. Nistica, Inc*., No. 13-CV-03345-BLF(JSC), 2015 WL 3988132, at *2 (N.D. Cal. June 30, 2015) ("[T]he party seeking to take the deposition need not prove conclusively that the deponent certainly has unique non-repetitive information; rather, 'where a corporate officer may have any first-hand knowledge of relevant facts, the deposition should be allowed.' . . . Even when the apex doctrine is at issue, however, 'the burden remains on the party' seeking to avoid the deposition.").

United National cannot meet its "heavy burden" here because: (1) the evidence discussed above suggests that Mr. Elliott may have "unique first-hand, non-repetitive knowledge of the facts at issue in the case;" and (2) Plaintiffs have "exhausted other less intrusive discovery methods," including by taking the

depositions of Mr. Elliott's subordinates, Ms. Hoffman (for a full day), Mr. DiGiovanni (for a full day), and John Malone (for a half day).

Under United National's view, Plaintiffs simply are not entitled to inquire into Mr. Elliott's personal knowledge under any circumstances through deposition testimony. But there are no "extraordinary circumstances" justifying that extreme position. Plaintiffs are entitled to inquire into his involvement, subject to reasonable time limitations that the Court may impose.

**B. United National Rejected Reasonable Positions That Would Have Avoided Burdening The Court With This Motion.**

United National's "all or nothing" approach is inconsistent even with the case law it cites. In *Apple Inc.*, for example, the court determined that Samsung's CEO was "the quintessential 'apex'" witness but ordered him and other executives to be deposed for two or three hours. 282 F.R.D. at 265; *see also Int'l Game Technology v. Illinois Nat'l Ins. Co*., 2018 WL 7499823 (D. Nev. April 6, 2018) (allowing the deposition of "the Global Head of Financial Lines, Specialty Claims" for AIG, limited to certain coverage topics for two hours); *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, 2006 WL 2578277, at *3 (N.D. Cal. Sept. 6, 2006), *objections overruled*, 2006 WL 3050866 (N.D. Cal. Oct. 23, 2006) (permitting the deposition of Google co-founder Larry Page, "limited in scope to Page's knowledge of and involvement in the policy change and [. . .] limited to three hours.").

Taking a cue from these cases, after the parties' telephonic conference with the Court, Plaintiffs offered to limit the deposition of Mr. Elliott to three hours in order to resolve this dispute, but United National refused. (Decl. of K. Jackson, at ¶ 2, Ex. L (November 17, 2021 email from Kirsten Jackson to Dan Katibah stating that "Plaintiffs will agree that the [Elliott] deposition will be limited in time to no more than 3 hours on the record.")).

Plaintiffs then offered a second alternative, proposing to forego Mr. Elliott's

deposition if United National: (a) produces certain training materials that it is withholding;[7] and (b) stipulates to the following facts that may be introduced into evidence and relied upon at trial:

- Mr. Elliott is informed of the facts and circumstances that this coverage action concerns;
- Mr. Elliott has reviewed the attached coverage letters dated August 6, 2018; September 18, 2018; and April 12, 2019;
- Mr. Elliott has reviewed the pleadings in the underlying actions that the above-referenced coverage letters concern;
- Mr. Elliott agrees with all of the decisions set forth in the above-referenced coverage letters;
- Mr. Elliott agrees that United National's training materials are part of the policies, practices, and procedures its claims handlers are expected to follow;[8]
- The decisions set forth in the above-referenced coverage letters are consistent with United National's policies, practices, and procedures regarding claims handling;

---

[7] Plaintiffs' Request for Production No. 16 specifically seeks all "training manuals" (*Id*. at ¶ 3, Ex. M (Plaintiffs' First Set of Requests for Production of Documents) (emphasis added)). United National did not identify any responsive training materials until Plaintiffs' 30(b)(6) deposition of United National, on November 15, 2021 – four days before the November 19 fact discovery cutoff – when Mr. DiGiovanni testified that United National keeps a repository of training materials on a database that claims handlers can reference and/or that are handed out to claims handlers. (*Id*. at ¶ 4, Ex. N (Further Excerpts of DiGiovanni Dep.) at 317:24-318:8). Despite repeated requests, both during and after the deposition, United National refuses to produce the training materials.

[8] *See, generally*, *Canales v. Am. Sec. Ins. Co.*, 2010 WL 11629029, at *2 (M.D. Fla. Apr. 28, 2010), the court determined that the noticing party was entitled to depose certain apex witnesses because the opposing party did not produce certain requested documents prior depositions. Therefore, the court found that it was "appropriate to allow Plaintiff to depose either of these two witnesses specifically about those documents." *Id*.

- If Mr. Elliott had been asked to participate in, approve of, or overrule any of the decisions set forth in the above-referenced coverage letters, he would have approved them; and
- Mr. Elliott would not now change any aspect of the decisions set forth in the above-referenced coverage letters.

(*Id*. at ¶ 5, Ex. O). United National also rejected this proposal. (*Id*. at ¶ 5, Ex. O). However, the offer remains open, and Plaintiffs are fine with the Court ordering this relief in lieu of ordering that Mr. Elliott be deposed (indeed, this may be preferable as it resolves other remaining discovery disputes).

Finally, Plaintiffs offered a third alternative resolution. After rejecting Plaintiffs' second alternative, Mr. Elliott amended his declaration to its current state. Plaintiffs again offered to forego deposing Mr. Elliott if "United National [is] willing to stipulate that Mr. Elliott's declaration may be used for all purposes in this lawsuit, including that it will be admissible at trial." (*Id.* at ¶5, Ex. O (December 16, 2021 email from Kirsten Jackson to Dan Katibah.). However, United National rejected this proposal as well, and indicated that if the declaration is used at trial,[9] United National may somehow try to "supplement it." (*Id.*). This position only confirms the obvious – that in the absence of agreeing to Plaintiffs' second alternative, Mr. Elliott should be ordered to sit for a short, two-hour deposition.

December 29, 2021 NIELSEN KATIBAH LLP

By: */s/ Daniel N. Katibah*
Daniel N. Katibah
Attorneys for defendant United National Insurance Company

[9] The Declaration of Mr. Elliot, who is a United National employee, is admissible evidence at trial under Rule 801(d)(2) of the Federal Rules of Evidence.

December 29, 2021 LATHAM & WATKINS LLP

By: _/s/ *Kirsten C. Jackson*__
Kirsten C. Jackson
Attorneys for plaintiffs L.A. Terminals, Inc., and Soco West, Inc.

**ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4(a)(2)(i)**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized this filing.

December 29, 2021 By: */s/ Daniel N. Katibah*
Daniel N. Katibah